[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION IN LIMINE TO PRECLUDE TESTIMONY OF JACQUES MORITZ, M.D. AS TO CHRISTINA DEZIELLE, M.D.
In this case, plaintiff Donna Kroha has brought suit, both individually and as Administratrix of the Estate of her deceased daughter, Ashley Eleanor Kroha, to recover money damages from three physicians — obstetrician-gynecologists ("Ob-Gyns") C. Bruce LaMonica, M.D. and Patrice Gillotti, M.D. and internist Christina Dezielle, M.D. — for alleged malpractice in their care and treatment of her shortly before her daughter was due to be born. In her Revised Amended Complaint dated September 25, 1998 ("Complaint"), the plaintiff claims that as a result of the defendants' malpractice, she personally suffered painful, disabling, and permanent physical injuries and her daughter, who was a viable fetus when the defendants began to care for her, died in utero. The defendants have denied all of the plaintiff's claims against them.
As for Dr. Dezielle, a Board-certified specialist in internal medicine, the plaintiff first became her patient on September 20, 1996, on a referral by one of her Ob-Gyns, Dr. LaMonica, to investigate the cause of her persistent epigastric pain. On that day and thereafter, claims the plaintiff, Dr. Dezielle was negligent in rendering professional medical care and treatment to her, in that:
 5. . . . she or one or more of her agents, employees or servants: CT Page 9640
 a. Failed to recognize, appreciate or manage the significance of the epigastric pain that Donna Kroha presented with on September 20, 1996;
 b. Failed to adequately and properly diagnose Donna Kroha's pre-eclampsia;
 c. Failed to perform adequate and diagnostic tests on Donna Kroha;
 d. Failed to appreciate the significance of the blood work which she had performed on the plaintiff on September 20, 1996;
 e. Failed to communicate or otherwise appraise Donna Kroha's OB-GYN in a timely fashion of the results of the blood work taken September 20, 1996;
 f. Failed to adequately and properly communicate with Donna Kroha's OB-GYN regarding her high blood pressure;
 g. Failed to perform adequate and proper laboratory tests on Donna Kroha;
 h. Failed to appraise Donna Kroha's OB-GYN in a timely fashion of the findings and assessments that she made on September 20, 1996;
 i. Failed to adequately and properly manage the plaintiff's high blood pressure; [and]
 j. Failed to adequately and properly treat the plaintiff's high blood pressure.
Complaint, Count V, ¶ 5; Count VI ¶ 5. As a direct and proximate result of Dr. Dezielle's alleged negligence as aforesaid, the plaintiff claims that her daughter died in utero on September 26, 1996; id., Count V, ¶ 6; and that she personally "developed pre-eclampsia with extensive hemorrhage from the liver, and a subcapsular hematoma of the liver, all of which required her to be hospitalized for an extended period of time and caused her to suffer great physical and mental pain, distress, anxiety and discomfort." Id., Count VI, ¶ 6.
To prove her claims against Dr. Dezielle, the plaintiff disclosed a medical expert witness, Dr. Jacques Moritz. In her operative Disclosure CT Page 9641 of Expert Witness dated September 1, 2000,[1] the plaintiff first gave general notice that
 Dr. Moritz is . . . expected to testify on the standard of care and obligations imposed upon internists, consulted or referred, by obstetricians, and in particular, Dr. Christina Dezielle, as well as on the subject of Dr. Dezielle's deviation from the standard of care and the injuries and damages caused to the plaintiffs as a result of those deviations and failures.
Disclosure of Expert Witness (9/1/00), p. 1. Thereafter, the Disclosure revealed that Dr. Moritz's anticipated testimony against Dr. Dezielle would be as follows:
 With respect to the defendant, Dr. Dezielle, Dr. Moritz is expected to testify that Dr. Dezielle failed exercise that degree of skill diligence and care ordinarily and customarily exercised by physicians in general in the State of Connecticut in 1996 by failing to adequately, properly and timely communicate the results of Donna Kroha's examination, blood work and ultrasound studies to either Dr. LaMonica or Dr. Gillotti and by failing to ensure that the results and reports of said study reached the referring physicians within a sufficient enough time for that physician to act upon the same. Dr. Moritz is also expected to testify that as a board certified internist, experienced in treating patients with hypertension, Dr. Dezielle was expected to be aware of the risks of pre-eclampsia and the signs and symptoms of that disease. Dr. Moritz will testify that Dr. Dezielle failed to appreciate the significance of the blood work and ultrasound studies she ordered, and failed to communicate the results of her examination, blood work and ultrasound findings to the referring physician.
 Dr. Moritz will further testify that as a result of Dr. Dezielle's deviations from the standard of care that Donna Kroha's pre-eclampsic condition was allowed to progress thereby causing the death of Ashley Eleanor Kroha in utero and the development of a subcapsular hematoma and liver injury in Donna Kroha. Dr. Moritz is further expected to testify that as a result of Dr. Dezielle's deviations from standard of care, that Donna Kroha required an extended hospital CT Page 9642 stay, multiple complicated medical tests and procedures, and was further caused to suffer extreme physical and emotional pain, distress and suffering and probable permanent liver damage.
Id. at 4-5. Finally, the Disclosure stated that
 All of Dr. Moritz' opinions as set forth above are based upon his background, education, training and experience as a practicing board certified obstetrician and gynecologist as well as his review of various peer reviewed journals, textbooks and studies on the diagnosis and treatment of pre-eclampsia or HELLP syndrome as well as his review of the medical records, deposition transcripts, interrogatory responses and pleadings in the above-captioned matter.
Id. at 5.
Shortly before the above-quoted Disclosure was filed, Dr. Moritz was deposed in New York City, where he has worked since 1994 as an obstetrician-gynecologist at St. Luke-Roosevelt Hospital. During his deposition, Dr. Moritz was questioned at length concerning the nature and substance of his opinions as to the defendants' alleged breaches of the standards of care for their respective medical specialties and the alleged role played by each such breach in causing the plaintiff's injuries and the death of her unborn child.
On the basis of the plaintiff's Disclosure and the deposition testimony of Dr. Moritz, Dr. Dezielle moved this Court in limine, on October 1, 2001, to enter an order precluding him from testifying against her at trial. Asserting in her Motion that Dr. Moritz "is not qualified to provide an opinion that [she], a Board Certified Internal Medicine physician, violated the standard of care of an Internal Medicine practitioner in examining, evaluating and treating the Plaintiff under the circumstances of this case[,]" Dr. Dezielle asked specifically for the issuance of an order
 1. Prohibiting the Plaintiffs from eliciting expert testimony from this disclosed expert concerning the standard of care of a reasonably prudent internist in evaluating a patient exhibiting signs consistent with preeclampsia or HELLP Syndrome;
 2. Prohibiting the Plaintiffs from eliciting expert opinion testimony from this disclosed expert relative CT Page 9643 to this Defendant's compliance with the standard of care of a reasonably prudent internist in evaluating a patient exhibiting signs consistent with preeclampsia of HELLP Syndrome;
 3. Prohibiting the Plaintiff from eliciting expert opinion testimony from this disclosed expert concerning the causation connection between the care rendered by this Defendant and the injuries allegedly suffered by the Plaintiffs.
The defendant initially supported her Motion with a memorandum of law dated October 1, 2001.
The plaintiff filed an Objection to the defendant's Motion on January 11, 2002. Attached to the Objection were an affidavit from Dr. Moritz dated January 10, 2002, excerpts from the deposition transcripts of Dr. Moritz and Dr. LaMonica, and an excerpt from the table of contents ofHarrison's Principles of Internal Medicine (15th ed. 2001).
The defendant answered the plaintiff's Objection with a reply memorandum dated January 25, 2002, which was accompanied by an excerpt from the deposition of Dr. Gillotti and the complete table of contents of the Harrison's treatise. Finally, on March 1, 2002, after the Court had heard oral argument on the Motion, the plaintiff filed a sur-reply brief together with a supplemental affidavit from Dr. Moritz dated February 27, 2002, extracts from several additional medical texts and treatises, and two more excerpts from the deposition transcripts of Dr. Moritz and Dr. LaMonica.
 I
Dr. Dezielle's initial challenge on this Motion is to the proposed expert testimony of Dr. Moritz concerning the standard of care that applied to her conduct in treating and caring for the plaintiff and her unborn daughter on and after September 20, 1996. The challenge arises under General Statutes § 52-184c, which at all times relevant to this case has provided in part as follows:
 (a) In any civil action to recover damages resulting from personal injury or wrongful death occurring on or after October 1, 1987, in which it is alleged that such injury or death resulted from the negligence of a health care provider, as defined in section 52-184b, the claimant shall have the burden of proving by the preponderance of the evidence that the alleged actions CT Page 9644 of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.
* * * *
 (c) If the defendant health care provider is certified by the appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself out as a specialist, a "similar health care provider" is one who: (1) Is trained and experienced in the same specialty; and (2) is certified by the appropriate American board in the same specialty; provided if the defendant health care provider is providing treatment or diagnosis for a condition which is not within his specialty, a specialist trained in the treatment or diagnosis for that condition shall be considered a "similar health care provider".
 (d) Any health care provider may testify as an expert in any action if he: (1) Is a "similar health care provider" pursuant to subsection (b) or (c) of this section; or (2) is not a similar health care provider pursuant to subsection (b) or (c) of this section but, to the satisfaction of the court, possesses sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. Such training, experience or knowledge shall be as a result of the active involvement in the practice or teaching of medicine within the five-year period before the incident giving rise to the claim.
So written, the statute not only confirms and carries forward the basic common-law rule that to prevail in a medical malpractice action, the plaintiff must prove that the defendant breached the prevailing professional standard of care for his medical specialty; see, e.g.,Fitzmaurice v. Flynn, 167 Conn. 609, 616 (1975); but establishes the CT Page 9645 minimum qualifications for any expert witness who may testify as to that standard or the breach thereof.
"The prevailing professional standard of care for a given health care provider[,]" as described in the statute, "[is] that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." C.G.S. § 52-184c (a). In the case of Dr. Dezielle, who at all times relevant to this case has been Board-certified in internal medicine, a "similar health care provider" is a health care provider who is trained, experienced and Board-certified in internal medicine or, if her challenged conduct constituted "providing treatment or diagnosis for a condition which [was] not within [her] specialty, a specialist in the treatment or diagnosis for that condition[.]" C.G.S. § 52-184c (c) . Here, insisting that her challenged care and treatment of the plaintiff fell squarely within her own specialized field of internal medicine, Dr. Dezielle contends that Dr. Moritz is not qualified to testify against her on the standard of care because he is not Board-certified in internal medicine.
The plaintiff has responded to this argument in two ways. First, she asserts that even though Dr. Moritz is not Board-certified in internal medicine, he "possesses sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide . . . expert testimony as to the prevailing professional standard of care" in the field of internal medicine. C.G.S. § 52-184c (d)(2). As for his opinion that the defendant breached the prevailing professional standard of care for internists by failing to diagnose her preeclampsia on September 20, 1996, the plaintiff contends that preeclampsia is a medical condition that both internists like Dr. Dezielle and Ob-Gyns like Dr. Moritz are trained to recognize and understand whenever they treat or care for pregnant women. Thus, allegedly, it falls within a zone of overlap between the two specialties, and can competently be testified about by members of each specialty.
The plaintiff further contends that Dr. Dezielle's alleged failure to communicate the results of her examination, tests and findings to Dr. LaMonica, the doctor who referred the plaintiff to her for those purposes, breached a standard of care common to all medical specialties, which all physicians are trained to follow from their earliest days in medical school. As a licensed physician who has taught medical students since 1988 and both made and received referrals of patients to and from other medical specialists, Dr. Moritz is allegedly competent to render an expert opinion on that subject under Section 52-184c (d)(2). CT Page 9646
The plaintiff's fallback argument as to the defendant's alleged negligence in failing to diagnose her preeclampsia is that if the defendant's experience in treating and diagnosing the medical complaints of pregnant women was so limited in September 1996 that she could not make that diagnosis, then she was "providing treatment or diagnosis for a condition which [was] not within [her] specialty," within the meaning of Section 52-184c (c), and must therefore be judged by the standard of care for Ob-Gyns, who, like Dr. Moritz, specialize in such treatment and diagnosis. In either case, the plaintiff argues, Dr. Moritz is qualified to testify against Dr. Dezielle under Section 52-184c (d).
 II
The Court must initially agree with the defendant that the Dr. Moritz is not generally qualified to testify as an expert in internal medicine. To begin with, of course, it is conceded that Dr. Moritz is not a Board-certified internist. More importantly, however, the record fails to disclose that he "possesses sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide . . . expert testimony as to the prevailing professional standard of care" in the field of internal medicine. C.G.S. § 52-184c (d).
Dr. Moritz completed medical school at the University of Miami in 1988. In the course of his clinical training in medical school, he was required to rotate through a variety of services, including internal medicine, in order to get his medical degree. By the time he graduated, however, he did not consider himself to be an expert in any medical specialty, including internal medicine.
During his first clinical rotation in medical school, which occurred in 1987, Dr. Moritz decided that the focus of his practice would be obstetrics and gynecology. Accordingly, when medical school was over, he began a combined internship and residency program in obstetrics and gynecology at Columbia-Presbyterian Hospital in New York City. As a participant in that program, Dr. Moritz's only exposure to internal medicine was in cases involving high-risk obstetrical patients. Thus, he thereby acquired no training or experience that exposed him to or required him to practice under the standard of care for internists. Indeed, to this day he has never even learned the requirements for, much less become eligible to take, the Boards in internal medicine.
Following his residency, Dr. Moritz was first employed as an obstetrician-gynecologist in the practice of Dr. Stephen Swersky, where he remained for about one year. In the year after he and Dr. Swersky parted company, he worked as a reporter for the Medical News Service. CT Page 9647 Finally, in 1994, he took a faculty position as an obstetrician-gynecologist at St. Luke-Roosevelt Hospital, where he has conducted a full-time practice in obstetrics and gynecology ever since. Currently, Dr. Moritz personally manages 200 pregnancies and delivers 150 babies each year.
As an obstetrician-gynecologist, Dr. Moritz does not practice internal medicine or hold himself out to be a specialist in internal medicine. He belongs to no professional societies or organizations to which internists belong, although he assumes they exist, and he reads no publications specially devoted to internal medicine.
In his practice, Dr. Moritz occasionally refers his obstetrical patients to other medical specialists for consultation. Sometimes, though rarely, he makes such referrals to specialists in internal medicine. In Dr. Moritz's experience, however, referrals to internists are never made in the third trimester of a patient's pregnancy. Referrals in that time frame are typically made to sub-specialists in the field of obstetrics and gynecology, who are intimately familiar with pregnancy and its complications.
 III
Despite his obvious lack of general experience or expertise in the field of internal medicine, Dr. Moritz testified at his deposition that he "ha[s] learned quite a bit of internal medicine since embarking on the field of obstetrics and gynecology." Moritz Deposition (8/23/01), p. 154. Based on that learning, which he claims to have accumulated in the practice, teaching and study of obstetrics and gynecology, Dr. Moritz asserts initially that Dr. Dezielle breached the standard of care for Board-certified internists in September of 1996 by failing to diagnose the plaintiff's preeclampsia when she presented for evaluation at that time. For the following reasons, the Court disagrees.
In Dr. Moritz's affidavit dated January 10, 2002, he described only one experience since his graduation from medical school when he received any training in internal medicine. "In 1993," he averred, "I received training in Internal Medicine through course work designed to train Ob-Gyn physicians in basic primary care for women." Moritz Affidavit (1/10/02), ¶ 6. The plaintiff asserts that this course work, coupled with Dr. Moritz's rotation through the internal medicine service when he was in medical school, gave him useful knowledge of the standard of care for a Board-certified internist. This claim, however, is entirely without merit.
As for the witness's medical school training, which admittedly did not CT Page 9648 make him an expert in internal medicine, it was both limited and outdated. Not only was it nothing more than every other medical school graduate then received, but it did not occur "within the five-year period before the incident giving rise to the claim." C.G.S. § 52-184c (d)
As for the witness's course work in 1993, it too was limited, both in scope and in purpose. "Designed," as it was, for Ob-Gyns rather than internists, it no doubt trained participants to practice in accordance with the standard of care for Ob-Gyns. Whether or not there are similarities between the standard of care for Ob-Gyns and the standard of care for internists as to the subjects covered in the course is a matter about which this Court, and more importantly the witness, can only speculate.
The substantive scope of the course, moreover, was expressly confined to "basic primary care for woman." Though Dr. Moritz has provided no explanation of what that means, it would not appear to include, and is not claimed to have included, the diagnosis of preeclampsia, which is routinely studied by Ob-Gyns as part of their basic training in obstetrics.
In conclusion, the Court finds that there is nothing in the witness's medical training, either during or after medical school, that in any way qualifies him to testify as an expert witness on the standard of care for Board-certified internists with respect to the diagnosis of preeclampsia in September of 1996.
Another basis upon which Dr. Moritz is claimed to have gained sufficient knowledge of internal medicine to testify as an expert on that subject in this case is his teaching of medical students rotating through the Ob-Gyn service at Columbia-Presbyterian Hospital since 1988. This experience, claims the witness, has made him aware of what all medical students are taught concerning the diagnosis of preeclampsia in pregnant women, and thus what all medical school graduates, including those who become Board-certified internists, are expected to know on that subject.
The defendant's response to this argument is simple but persuasive. All of Dr. Moritz' teaching is obviously in the field of obstetrics and gynecology, not internal medicine. His only professional medical training and experience is in obstetrics and gynecology, and thus the only standard of care he knows and teaches to his students is that by which he personally practices, to wit: the standard of care for a Board-certified Ob-Gyn. That medical students rotating through the Ob-Gyn service are necessarily taught obstetrics under that standard does not make them experts in obstetrics, any more than Dr. Moritz's rotation through the internal medicine service while he was in medical school made him an CT Page 9649 expert in internal medicine. Nor, more importantly, does the receipt of such training from a Board-certified specialist later require a student who enters a different field of medical practice to use what he has learned under the same standards of care that governed the practice of his Board-certified trainer. Instead, to reiterate, each physician is governed in his own medical practice by the standard of care that applies specifically to that practice, not that of any other medical specialty. It therefore does not follow that because Dr. Moritz has long trained his medical students about preeclampsia in the Ob-Gyn rotation at Columbia-Presbyterian Hospital, those students, after medical school, as Board-certified specialists in other fields, including internal medicine, will be required to know and use what he taught them in the practice of their own medical specialties. If the contrary were presumed, then every physician who was ever trained in medical school by a Board-certified specialist in any field could always be held to the standard of that specialist when dealing with the subject matter of that training. That, however, is not our law. Accordingly, the Court rejects the plaintiff's argument that Dr. Moritz's training of medical students in obstetrics since 1988 makes him qualified to testify as an expert as to what a Board-certified internist should have known about preeclampsia in September of 1996.
A final basis upon which the plaintiff claims that Dr. Moritz is competent to establish the standard of care for Board-certified internists as to the diagnosis of preeclampsia in is his professed familiarity with textbooks and treatises about internal medicine. Attached to the plaintiff's Objection to this Motion is an excerpt from the table of contents from Harrison's Principles of Internal Medicine
(15th ed. 2001), a work cited by Dr. Moritz at his deposition. Moritz Deposition (8/23/01), p. 229. The witness mentioned the book in the course of the following exchange with Dr. Dezielle's counsel:
 Q. You also indicate that Dr. Dezielle was experienced in treating patients with hypertension. Do you see that?
A. Yes.
Q. Is that your testimony?
A. Yes.
Q. What do you base that opinion on?
A. On being a Board certified internist. CT Page 9650
 Q. Does that mean that she is experienced in treating patients with hypertension?
A. More than likely, yes.
Q. Do you know that?
 A. I don't know her particular training, but in the current edition of the two classic internal medicine books, when you open it up to hypertension, either Cecil or Harrison, there is a complete chapter on hypertension in pregnancy.
 Q. When you say "the current ones," when were they published?
A. They are published every year.
Id. at pp. 229-30.
The foregoing testimony, however, does nothing to establish Dr. Moritz's credentials to testify as an expert witness concerning the standard of care for Board-certified internists in September of 1996. Though the witness may have known that Harrison's was a "classic internal medicine book" before he agreed to testify as an expert in this case, and may even have known that it contained a chapter on hypertension during pregnancy, his mere knowledge of those facts does not make him an expert in internal medicine. If that were true, every experienced librarian would be the quintessential expert witness on every issue in every case.
In fact, the plaintiff has it backwards. In Connecticut, a qualified expert witness who has formed an opinion about a matter within his area of expertise may rely upon statements in a treatise which he recognizes as authoritative in his field. Before he may do so, however, he must first be shown to be an expert in the relevant field. See ConnecticutCode of Evidence, § 8-3 (8) A person with no expertise in a field does not become an expert in that field merely by identifying resources where the knowledge of true experts can be found.
Dr. Moritz, of course, is not an expert in internal medicine. Moreover, he has no basis for recognizing the texts to which he points as authoritative in any other field. He does not claim that he owns the books, or consults them for any purpose when he practices or teaches obstetrics and gynecology. He thus cannot base opinions on them for any purpose, much less use his knowledge of them as a basis for establishing his own expertise. CT Page 9651
For the same reasons, Dr. Moritz fares no better with respect to the other texts and treatises which the plaintiff has appended to her sur-reply brief in opposition to this Motion. Though the contents of those books, if recognized as authoritative by a proper expert in internal medicine, might support an opinion that a Board-certified internist should have been able to diagnose preeclampsia in a pregnant woman presenting with the plaintiff's symptoms in September of 1996, Dr. Moritz cannot competently present such expert testimony.
 IV
The second basis upon which the plaintiff claims that Dr. Moritz is qualified to testify as an expert witness on the standard of care applicable to Dr. Dezielle is that in rendering care, treatment and diagnostic services to her, Dr. Dezielle was "providing treatment or diagnosis for a condition which [was] not within h[er] specialty," within the meaning of Section 52-184c (c), and thereby subjected herself to evaluation under the prevailing professional standard of care for "a specialist trained in the treatment and diagnosis of that condition," to wit: a Board-certified Ob-Gyn. Since Dr. Moritz is a Board-certified Ob-Gyn, he is plainly competent to render an expert opinion under that standard of care, if in fact it is applicable to this case.
To determine if that standard of care is applicable, the Court must first decide if Dr. Dezielle was "providing treatment or diagnosis for a condition which [was] not within h[er] specialty." Id. To that end, it must begin by interpreting the relevant statutory language.
Superficially, at least, the statute can be read to require physicians to diagnose and treat each of their patients in accordance with the standard of care that applies to the particular specialist who is ultimately responsible for diagnosing and treating the patient's actual ailment or condition. So interpreted, however, the statute would unfairly impose a form of strict liability upon any physician who agreed to treat or diagnose a patient with an unknown ailment or condition. If, for example, a patient seeking treatment for what appeared to be a common cold was actually suffering from a rare tropical disease, the internist who treated him would unwittingly expose himself to post hoc criticism and evaluation under the standard of care for doctors specializing in tropical diseases. Similarly, if the patient was actually suffering from a different disease or condition, the internist, by taking the case, would commit himself to diagnosing and treating the patient under the higher standards of those physicians who are specially trained diagnose and treat that disease or condition. CT Page 9652
The obvious problem with the foregoing interpretation of the statute is that it would discourage medical practitioners from doing what they do best — that is, gathering information about their patients' unsolved medical problems and finding solutions for those problems by applying professional skill and judgment to what they learn. It is highly unlikely that the legislature intended to create such a strong disincentive for doctors to accept challenging cases.
In fact, an alternative reading of the statute would avoid creating this disincentive while protecting patients from risky dabbling by physicians in specialties not their own. That reading would gear the standard of care for the treatment or diagnosis of a patient not to the actual nature of the patient's underlying problem or condition, as it is ultimately determined to be, but to the circumstances of the patient's clinical presentation and the nature of the physician's undertaking with respect to the patient in light of those circumstances. So understood, the statute would subject a physician to evaluation under the standard of care for a different medical specialist only if he undertook to treat or diagnose a patient after he learned or should have learned that the patient was suffering from a condition that was not within his own medical specialty. By embarking upon or continuing a course of diagnosis or treatment for a condition that he knows or should realize to be outside his specialty, a physician naturally creates a risk that the patient will be harmed in a way that could be avoided by referring the patient to a qualified specialist. By voluntarily stepping into the shoes of the specialist, the doctor may fairly exposes his professional care and treatment of the patient to evaluation under the standard of care applicable to that specialist, and thus is appropriately held accountable for the consequences of his own ignorance or inexperience. The Court believes that this interpretation of the statutory language is correct, for it would treat any doctor who voluntarily engages in off-specialty practice just like any doctor who, though not Board-certified in an area of specialized medical practice, "holds himself out as a specialist" in that area. C.G.S. § 52-184c (c).
Examined from this perspective, the question presented in this case is not whether preeclampsia is a condition falling within the practice of internal medicine. Instead, the question is whether Dr. Dezielle was acting within her specialty of internal medicine when she accepted the plaintiff as her patient on September 20, 1996. That question, in turn, depends upon the nature of the plaintiff's presentation to Dr. Dezielle and the purposes for which the doctor accepted her as a patient.
Dr. Dezielle never saw the plaintiff as a patient before or after September 20, 1996. On that day, the plaintiff came to see her at the suggestion of Dr. LaMonica, one of her Ob-Gyns, who wished to determine CT Page 9653 if there might any non-pregnancy-related reason for her recurring epigastric pain, which he had been unable to diagnose. The plaintiff informed Dr. Dezielle that she had seen Dr. LaMonica the day before, that he was treating her for hypertension, and that he had sent her over because of "this pain that was like a knife going between my breastbone and my shoulder blades." Kroha Deposition (6/1/99), p. 74.
Dr. LaMonica confirmed that he had referred the plaintiff to Dr. Dezielle to determine if she might have a problem with one of her internal organs that was producing her severe pain. Of particular concern to him, as he testified at his deposition, were possible problems with her gall bladder, her pancreas, her liver, or her intestines. LaMonica Deposition (5/8/00), pp. 269, 272. His differential diagnosis at the time of making the referral was that the plaintiff's pain "was not . . . related to her pregnancy." Id. at 272. He thought an internist could help him because "I didn't think she had severe preeclampsia or HELLP syndrome. I was ruling out any non pregnancy related problems." Id. at 275.
Against this background, Dr. Dezielle accepted the plaintiff as a patient for reasons that had nothing to do with her pregnancy. Accordingly, after physically examining the plaintiff and confirming, as the plaintiff had reported, that she had high blood pressure, she had a nurse draw blood for laboratory testing and ordered an ultrasound at Danbury Hospital to check the status of her internal organs. She specifically instructed her staff to have the results of the blood tests sent to Dr. LaMonica for his later use in managing her pregnancy.
When the blood tests and the ultrasound results were received on September 23, 1996 and found to be normal, Dr. Dezielle telephoned the plaintiff to so report. After leaving the plaintiff a message, she spoke personally with the plaintiff the following day.
In light of this history of Dr. Dezielle's interactions with the plaintiff, it is apparent that the doctor's entire course of conduct fell well within her specialty of internal medicine. She accepted the plaintiff as her patient on referral from her Ob-Gyn, who was treating her for hypertension and had seen her the day before. The specific reason for the referral was to determine if any problems with her internal organs might be causing her severe epigastric pain. The steps Dr. Dezielle took to answer Dr. LaMonica's inquiry were appropriately geared to answer that inquiry. She conducted a physical examination, drew blood for laboratory testing, and referred the patient for an ultrasound, all for the purpose of determining if she had some non-pregnancy-related problem with one of her internal organs that might be causing her pain. Finding none, she reported the results to Mrs. Kroha and claims to have instructed her CT Page 9654 staff to transmit them to Dr. LaMonica as well.
The Court cannot find that any of this conduct fell outside of the defendant's specialty of internal medicine. As a result, it concludes that her alleged failure to diagnose the plaintiff's preeclampsia must be judged by the standard of care of a Board-certified internist, not that of a Board-certified Ob-Gyn like Dr. Moritz. Therefore, for all of the reasons stated in Parts II and III of this Memorandum of Decision, the Court hereby concludes that the testimony of Dr. Moritz must be precluded, insofar as it relates to the defendant's alleged negligence in failing to diagnose the plaintiff's preeclampsia on and after September 20, 1996. Dr. Moritz is not competent to testify on that subject under Section 52-184c (d).
 V
The defendant has also moved to preclude Dr. Moritz's expected testimony that she breached the standard of care for Board-certified internists by failing to communicate the results of the plaintiff's physical examination, blood tests and ultrasound results to Dr. LaMonica or Dr. Gillotti after she received them on September 23, 1996. The basis for this testimony, as stated in the plaintiff's Disclosure of Expert Witness, is Dr. Moritz's claimed knowledge the requirement of making complete and timely communications as to the results of tests, procedures and examinations of patients referred for consultation is the universal practice in all fields of medical practice. All doctors, he claims, learn the critical importance of this practice from their earliest days in medical school and are trained to follow practice in each of their clinical rotations, regardless of medical specialty.
Though Dr. Moritz is not a Board-certified internist, or a person intimately familiar with the practice of internal medicine, he has made referrals to internists ever since he started his medical practice and received referrals from them. His experience with such referrals, as he describes it in his supplemental affidavit dated February 27, 2002, is that internists, no less than all other medical specialists, routinely follow that practice as part of their standard practice. Moritz Supplemental Affidavit (2/27/02), ¶ 2.
Dr. Moritz claims, moreover, that the basic standards governing referrals and consultations between physicians of different specialties were not specialty-specific between 1991 and 1996. In support of that claim, he cites several non-specialty-specific source books which confirm the existence of that practice, just as he claims to have taught it to his medical students in the relevant time frame. CT Page 9655
On the basis of this experience in the practice and teaching of obstetrics and gynecology in the five-year period preceding the incident here in question, the Court finds that Dr. Moritz is competent to testify that Dr. Dezielle breached the standard of care for Board-certified internists by failing personally to communicate, and/or to ensure the immediate communication of, the full results of her consultation to the Ob-Gyns who referred the plaintiff for consultation.
 VI
The defendant's next challenge to the proposed expert testimony of Dr. Moritz goes to his disclosed opinion that her alleged breach of the prevailing professional standard of care for a Board-certified internist on September 20, 1996 proximately caused the plaintiff to suffer serious physical injuries and her unborn daughter to die in utero. The defendant bases this challenge not on Dr. Moritz's professional qualifications to render a valid opinion on medical causation, but on his admitted inability to do so with "reasonable medical probability" in this case.
With respect to the causal connection between the defendant's alleged failure to diagnose the plaintiff's preeclampsia on September 20, 1996, the defendant relies on the following excerpt from the deposition of Dr. Moritz on August 23, 2001:
 Q. As you sit here today, you are not able to state with reasonable medical probability that any breach that may have occurred on the 20th by Dr. Dezielle caused harm to Donna Kroha?
MR. RENEHAN: Objection to the form of the question.
A. I don't know that with certainty.
 Q. You don't know that with reasonable medical probability?
A. That's correct.
 Q. Similarly, you don't know with reasonable medical probability that any breach that occurred on the 20th had any effect on the viability of the baby?
A. I don't know that with certainty.
Q. or with reasonable medical probability? CT Page 9656
A. That's correct.
Moritz Deposition (8/23/01), p. 196. Since it is a matter of axiom that expert testimony on the subject of medical causation must be based upon a reasonable degree of medical probability, and Dr. Moritz has flatly stated that he cannot offer such causation testimony, the defendant contends that any future effort by the plaintiff to elicit such testimony from him must be precluded.
The plaintiff has responded to this argument by claiming that the defendant has mischaracterized Dr. Moritz's testimony. She objects, in particular, to the omission from his testimony of the following question and answer which preceded the portion upon which the defendant relies:
 Q. Can you tell me whether or not, in your opinion, the breach you indicated that Dr. Dezielle committed on the 20th of September resulted in any harm to Donna Kroha?
 A. I would say if the diagnosis were made and she were hospitalized, more than likely she would have had a live born and have no untoward effect on herself.
Moritz Deposition (8/23/01), pp. 194-95. In light of this testimony, claims the plaintiff, her witness is fully prepared to support her claim of legal causation.
The Court, however, concludes that the foregoing question and answer do nothing to change the substance or significance of the deposition testimony upon which the defendant relies. Preceding those questions and answers by a matter of moments, they were devoid of any reference to the controlling legal standard for the admissibility of medical causation testimony. Thus they were merely a prelude to the standard-based questions which followed. Those standard-based questions, moreover, could not have been simpler or more straightforward. Hardly traps for the unwary, mired in confusing legal jargon, they simply asked the witness if he could testify to causation by the controlling legal standard. Just as simply and straightforwardly, the witness answered that he could not.
The "reasonable probability" standard for the admission of medical causation testimony is well established in Connecticut. Hence, though the talismanic invocation of that standard is not absolutely necessary to ensure the admissibility of medical causation testimony in this State;Aspiaza v. Orgera, 205 Conn. 623, 632 (1987); that is only because other forms of words may at times be understood to mean the same thing. By contrast, when a witness not only fails to invoke the standard but CT Page 9657 expressly states that he cannot testify to causation thereunder, any causation testimony he offers must be precluded.
Against that background, the significance of the witness's deposition testimony could not have been lost on the plaintiff's experienced counsel. Once the witness answered as he did, it was incumbent upon the plaintiff to seek clarification or qualification of his testimony if it was given in error. Here, however, no such clarification or qualification was ever attempted, and the witness said nothing further at the deposition to suggest that he had misunderstood the question or misstated his views on the subject of causation. Accordingly, the witness's answer must stand as it was given.
Of final note and interest on this subject is Dr. Moritz's supplemental affidavit dated February 27, 2002, which was prepared and submitted after oral argument was heard on this Motion, and thus after the defendant's standard-based argument on legal causation had been fully explained. In that affidavit, after alleging once again that Dr. Dezielle had breached the standard of care for Board-certified internists by failing to diagnose her preeclampsia on September 20, 1996, Dr. Moritz simply stated that that failure of diagnosis had "caused harm to her patient." Moritz Supplemental Affidavit (2/27/02), ¶ 4. Curiously, Dr. Moritz did not alter his deposition testimony by stating his opinion in terms of reasonable medical probability.
Against this background, the witness's unmodified deposition testimony requires that he be precluded from testifying at trial as to the alleged causal connection between the defendant's failure to diagnose the plaintiff's preeclampsia and the injuries and death for which she seeks damages in this case.
 VII
The defendant's final challenge to the proposed expert testimony of Dr. Moritz goes to his opinion that her failure to timely communicate the full results of her consultation as to the plaintiff to Dr. LaMonica or Dr. Gillotti proximately caused the plaintiff's injuries and the death of her unborn child. On this score the defendant points to Dr. Moritz's testimony near the end of his deposition, where he was asked to assume that on September 24, 1996, two days before the plaintiff's daughter diedin utero, one of her Ob-Gyns, Dr. Gillotti, knew that her ultrasound and blood work had been done, knew that the results of those tests and procedures could be obtained, but would not have changed her treatment of the plaintiff even if she had received those results. Dr. Moritz testified that if those assumptions were correct, then Dr. Dezielle's alleged failure to communicate the results of her consultation to Dr. CT Page 9658 Gillotti would have been of no importance. Moritz Deposition (8/23/01), p. 228.
The plaintiff opposes this part of the defendant's Motion by arguing, correctly, that the facts assumed in the defendant's hypothetical question are not conclusively established. To the contrary, she argues, they are directly contradicted by the testimony of her other Ob-Gyn, Dr. LaMonica. Dr. LaMonica testified that those results, had he received them, would have caused him to call the plaintiff in for further examination, which might in turn have led to her hospitalization and the delivery of her baby. Dr. Moritz has stated that if the plaintiff had been hospitalized and the baby been delivered as late as September 24, 1996, the plaintiff's injuries would probably have been avoided and her baby would probably have lived.
The Court agrees with the plaintiff that, although it may ultimately be appropriate for the Court to prevent the witness from testifying at trial in manner that contradicts his deposition testimony, there is nothing about that testimony that now precludes him from testifying that Dr. Dezielle's failure to timely communicate the full results of her consultation concerning the plaintiff to her referring Ob-Gyns delayed her hospitalization, and thereby proximately caused her complained of injuries and her daughter's death.
 CONCLUSION
For all of the foregoing reasons, the defendant's Motion is hereby GRANTED with respect to Dr. Moritz's proposed testimony that the defendant breached the standard of care for Board-certified internists by failing to diagnose her preeclampsia on or after September 20, 1996, and that that breach proximately caused her complained-of injuries and her daughter's death. The Motion is DENIED, however, with respect to Dr. Moritz's proposed testimony that the defendant breached the standard of care for all licensed physicians, including Board-certified internists, by failing to timely communicate the full results of her consultation concerning the plaintiff to her referring Ob-Gyns, and that that breach proximately caused her complained-of injuries and her daughter's death.
IT IS SO ORDERED this 29th day of July, 2002.
 ___________________, J. MICHAEL R. SHELDON